Good morning and welcome, everyone, to the Ninth Circuit Court of Appeals. It's a pleasure to be here today and to hear all the oral arguments that will be presented in these cases. I want to acknowledge Judge Gould, who's here via video. Judge Gould, good morning. Can you hear us? Good morning. Yes, I can hear you very well. Very good. And Judge Gould and I, before we begin, would like to extend our great appreciation to Chief Judge Cole of the Sixth Circuit Court of Appeals, who's sitting here today by designation and is helping us with our docket. And we're very grateful that you're here. Thank you very much. Thank you. I'd like to begin this morning. The first case for oral argument is Club One Casino v. David Bernhardt. If the parties are ready to proceed, then please come forward. Good morning, Your Honors. May it please the Court, Olinx appearing on behalf of appellants, I'd like to reserve three minutes of my time. In 2014, four million California voters, a 61% majority, overwhelmingly rejected a compact for a Nevada-style casino on the Madera parcel that is the subject of this litigation. That vote should have ended the matter, because here we are in a case where the Federal government, pushing a new and radical theory, ignores the will of the people and proceeds to cram down that casino on a State that doesn't want it. Where is the State? The State is not a party in this case. I'm curious, and I just noticed that it was. No. That's a really — sorry, Your Honor. No. I just wanted to see if you could enlighten us or give any information. The State has not participated in this case. And what it prompts me to offer as a thought to the Court as it goes through and analyzing the issues, I'm going to talk about the statute and what the statute says and a related statute on Federal jurisdiction. But to the extent my clients are seeking to vindicate rights under the Tenth Amendment, those are rights that belong to them. Tenth Amendment rights don't just belong to the State. The Supreme Court has been very clear about that in Bond v. United States. And when you look at the Madera parcel, what do we have? We have a piece of farmland in the Central Valley. Now, California has enjoyed exclusive primary jurisdiction over that land since statehood. It has never ceded one iota of that jurisdiction to the Federal Government. The land is not the tribe's reservation. And it is undisputed on this record that this is land that has never been settled or governed by an Indian tribe. It was given to the Federal Government by a private casino company in 2013. There is no case. There is no statute. There is no principle of constitutional law that allows a private party's deed to somehow shift, take away, or reduce the State's primary jurisdiction over land within its borders. That is the nub of this case. Now the Federal Government ignores that principle. And here's the Government's argument. And when I said a radical theory, I meant it. This is a heading from the Government's brief. And this is their argument. Tribal and Federal jurisdiction over the Madera parcel arose without State consent or session. There's no case that says that. There's no statute that says that. In fact, the Federal Jurisdiction Statute, Title 40, Section 3112, says the opposite. It says if any department of the Federal Government deems it advisable to acquire jurisdiction, you do that by requesting a session from the site estate. Do you acknowledge, Counsel, that in order for you to prevail on this appeal, it appears that this Court would have to create at least two circuit splits? What's your response to that? I don't think that's true, Your Honor, and I'd like to respond to that. I'm going to talk about some of the cases that come up in this area. There's no case that I have seen that specifically analyzes the Federal power to unilaterally acquire territorial jurisdiction. There are some cases that assume it, but they don't analyze where would that power emanate from. And the Gaming Act here is very, very specific. It's talking about jurisdiction over land, not over people, over land, and it doesn't say that just once. It's repeated throughout the statute, and in particular, the part of the statute that says gambling comes up seven times in that part of the statute. And you have, for example, Section 2710d1a, to proceed, a tribe must enact an ordinance, but it's got to be a tribe with jurisdiction over the casino site. 2710d3, in order to request the state to enter into negotiations, the tribe must have jurisdiction over the casino site. For the mediation process to be invoked, the tribe must have jurisdiction over the casino site, and the Secretary of the Interior doesn't have authority to issue secretarial procedures unless it is land over which the tribe has jurisdiction. Does the tribe here exercise any governmental authority over the site, such as contracting for law enforcement, services, firefighting, things of that nature? No. The only thing in this record, Your Honor, that goes to the exercise of governmental power, which of course is a separate requirement from jurisdiction. You have to have jurisdiction over the site, and then it's got to be land over which the tribe exercises governmental power. The only thing in the record is a grazing ordinance, and I would suggest a couple things about that, if I might. Number one, that ordinance, if you will, is more akin to the exercise of a landowner's rights as opposed to governmental power. Why do I say that? Because if I own land, I can require somebody to pay me a fee to come on my land. If I have ranch land, they want to graze cattle, I can give them permission to do that. I could give them an easement. I could give them a lease. Those are landowner's rights. What we're talking about in the Gaming Act is first acquiring jurisdiction and then having lands that the tribe has not just acquired beneficially because a casino company gave it to the Federal Government, but land that the tribe is actively occupying and governing. And if you look at the cases and the ---- But the ---- you say the tribe didn't exercise any governmental authority, but as I understand it, and please correct me if I'm wrong, the tribe seems to exercise some governmental power over the land based on the fact that in late 2006, the tribe entered into an enforceable and binding, I recall, intergovernmental agreements with the County of Madera and the City of Madera for the provision of law enforcement and fire. Why isn't that sufficient to address the governmental authority and power? That's a very good question, Your Honor, and let me tell you what my response is. Those things were done before the tribe had an interest in this land. You can't exercise governmental power over something that you don't have, and you don't have jurisdiction. What's your authority for that? Look at the Gaming Act. It has two requirements. One is to get jurisdiction. The other is to exercise governmental power. You can't just create governmental power without having jurisdiction that underlies it. That's the famous quote that the exercise of governmental power without jurisdiction is ineffective, and at worst, it's invasion. Jurisdiction comes first, and the Supreme Court has been very clear on this point to the extent that what you find with most Indian reservations in the country, if you look at the admission statutes of many states, there's an express, not trying to make a pun here, there's an express reservation of jurisdiction in the federal government. But there seemed to be another example when it enacted an ordinance in October of 2015 approving a conservation plan for the Madera site, and I believe the case of Walnut Creek and the Panang tribe of Gay Head held that a tribe that enacts ordinances and enters into intergovernmental agreements with state and local governments exercises governmental power sufficiently within the meaning of IGRA. So I guess, do you have any authority that contradicts that? If you look at, there's a case that came out of the Eighth Circuit, I think it involved the Cheyenne Sioux, where the court went through a litany of examples of how a tribe could exercise governmental power, and it's not just one ordinance. It was a litany of things. As you recounted, that you have housing, you have police, you have fire protection, you're doing all kinds of things on the land. I would add, Your Honor, that when you look at the case you cited, the Wampanoag case, there was a stipulation in that case that the tribe had jurisdiction. There was a stipulation there. There's no stipulation here. You have to start with jurisdiction. Yeah, let's, let me, before your time goes up here, as I understand it, one of your arguments is that IGRA requires the Secretary to make formal determinations as to whether the tribe possessed jurisdiction and exercised governmental power over the Madera site, as you have been asserting. But what specifically in IGRA or other federal law requires those formal determinations? Can you point to me? I think that the response is that the statute sets a gateway requirement of having jurisdiction. If the tribe doesn't have jurisdiction, the Secretary doesn't have authority to act. We say what the Secretary should have done was look at the facts, look at the history of this land, and ask, who has jurisdiction over it? We know the state had it before that private deed was recorded. Did that private deed? Counsel, is Judge Gould, if I can interject a question? Yes, Your Honor. At some point here, the private party, I thought, transferred the land to the federal government, which it then held in trust for the tribe. That's correct. Is that right? That is correct. So if that's correct, then even without a formal session of the state, isn't there some precedent saying that in that context, the state retained some jurisdiction, but the tribe also has partial jurisdiction over the property? I think the problem with any court that would say that, Your Honor, is that you run up against the federal jurisdiction statute, which is Section 3112, which speaks to the acquisition of any quantum of jurisdiction, whether it's exclusive, whether it's partial, or whether it's concurrent. And the Supreme Court has made clear that that is the rule under that section. And so what you have here is a constitutional and statutory structure that respects states' primary jurisdiction over land within its borders. And that jurisdiction is not diminished without the state's consent, and you can't create jurisdiction out of thin air. That's our position in this case. And if one looks, let me just give you one last example here, because I know we're running short on time, and I do want to have some time reserved. The Fort Leavenworth case, older case, no question about it, 1875, 1885 I think it was, talked about how the federal government could have a military installation, but through perhaps inadvertence or mistake, somebody forgot about reserving jurisdiction to the federal government over that land. And the court said the way one corrects that is by getting a cession from the state. And that state, it was Kansas. And they got a cession. It wasn't complete jurisdiction, but they got a cession. Yosemite here in California, that case at the Supreme Court, Collins v. Yosemite, where the Supreme Court said 50 years after Fort Leavenworth, the way to adjust jurisdiction between sovereigns is through a cession. That's how sovereigns do it, sovereign to sovereign. One sovereign doesn't just take it from another and doesn't create jurisdiction that undercuts what's already there. As the Supreme Court has said most recently in the Hawaii case, the consequences of statehood are immediate, they are complete, and you can't alter them after the fact. And in this case, you know, there's a separate point we have about concession. There are statutory grounds upon which to say this casino, this project doesn't fit within the framework. And if the court says that the case is over, if the court says jurisdiction transferred, which is what the district court said, that's the federal government's position, if you say that, then you're going to come up against the Tenth Amendment, and you're going to have to square that within that concept. Thank you. Thank you. You've used all your time. Oh. Okay. Good morning, Your Honors. May it please the Court to move our roundtree for the United States. Judge McGee, you pointed out the fact that the appellants indeed are asking the Court to create a circuit split on the issue of tribal jurisdiction here. If we begin from the premise that the only action before this Court is the issuance of the secretarial procedures, the threshold question is whether the tribe had jurisdiction at the time the procedures were issued. The answer is yes, and we know that because once the Secretary acquired the Madeira parcel in trust for the tribe under the Indian Reorganization Act, that parcel became Indian country. And we know that because the Supreme Court's decision in Venati established that once the federal government sets aside land for a tribe, and the federal government maintains some federal superintendents over that land, it becomes Indian country. And indeed, that's the circumstances that occur under the Indian Reorganization Act. So here... So this parcel was taken in trust through the IRA, is that correct? Correct. And so once it was taken in trust, then that's when the IGRA statute comes in? Well, no. Once... Sticking with the IRA, once the land was taken in trust under that statute, there was a grant of federal and tribal jurisdiction that operated as a matter of law. And as I said, the sequence being the land's taken into trust, it becomes Indian country, and then you have federal and tribal jurisdiction that results as a matter of law under the Indian Reorganization Act. And... There... Go ahead. And in this case, what impact does a state referendum have on that process? In this particular case, it doesn't have an effect. The referendum, and if the Court will just bear with me if we go through the short timeline, the referendum occurred, the vote was taken in 2014. Prior to that time, and on this record, there were a series of events that led to the ultimate issue of this secretarial procedures here, but it also led to the land being taken into trust, tribal jurisdiction being established. So if we begin in 2011, the federal government made a two-part determination. It's called the two-part determination under Section 2719. And in that two-part determination, the secretary determined that gaming could be conducted on the Madeira parcel. It then sent that two-part recommendation to the governor, and the governor concurred in 2012. And in 2012, the governor signed a compact with the tribe, sent that to the state legislature, which voted and passed it. Then, through what had been a long procedure, the government acquired, finally acquired, the land in trust for the tribe. In 2013, as I said, the state legislature now ratified the compact with the tribe, and the compact set the way in which the gaming would be conducted. And in 2013, the state then sent the ratified compact to the secretary for final approval, and in October 2013, the secretary approved the compact, and at that point, all was a go. The land had been acquired in trust, the tribal jurisdiction kicked in, the compact had been certified and approved. And it wasn't until November of 2013 that the referendum was even certified. Everything had been, had taken place before then. So on this record, all that was relevant to the questions of jurisdiction, for example, were taken care of and in place prior to the referendum. The referendum had only one effect, and if the court looks at the exact language of the referendum, it speaks only to the validity of the tribal state compact that the governor entered into in 2012. It's the compact that was nullified. And that's why the tribe had to go back to the state, going to the factual background of this case, the tribe had to go back to the state and say, will you please renegotiate for a new compact, because the old one's been nullified. This case didn't have to go back to going back to the land acquisition, or going back to the secretary's two-part determination about whether gaming could occur. But as a result of that, then the process then turned to the special procedures. Is that correct? Correct. And so I guess I'm curious, how, seems like that's rather rare, going through special procedures, or is it? I can't speak to whether it is, but the fact that there are specific remedial provisions in the statute makes me think that if nothing else, Congress anticipated and there's a way to address it when the circumstances arise. And so you don't know how many times that the enactment of IGRA have happened through the secretarial procedures being issued? I'm afraid I do not. I can't give you a number, but if the court would like, I could provide that later. So what do we do, since there's a case pending before the California Supreme Court concerning the authority of the governor of California to concur in the secretary's determination to take land in trust for the benefit of tribes? What impact, if any, does that have on this one? On the record here, Your Honor, there is no effect. The IGRA doesn't provide... So we don't care what the California Supreme Court says on this? As to the issuance of the secretarial procedures, on the record, before the secretary at the time the procedures were issued, no. IGRA doesn't anticipate that, for example, when the secretary gets a concurrence in the two-part determination from the State or when it gets a finally approved and legislatively approved compact, that after all of the requirements are met, that, let's say, years later, the secretaries to go back and look and say, well, let me reassess, we have to reassess whether there was validity as to the determinations and decisions rendered by the State. I don't know if Your Honors are familiar with NEPA, the National Environmental Policy Act, but unlike NEPA, where the government is to keep abreast of circumstances on the ground and maybe will have to supplement its decision, there's no requirement that the government is to do so here. So we are here on the record. This Court is judging the secretary's actions on the record that was before the secretary at the time the procedures were issued. Part of this appeal seems to turn on the meaning of jurisdiction, the term jurisdiction, and the phrase exercises governmental power, which appear to be undefined in the IGRA. What do you – how do you define it? How should we define it? And I'm just curious, how do we approach this? Because this is being challenged under the APA. Do we apply Chevron deference at all to your argument? Can you help me sort that out? Well, Your Honor, as to an exact definition, I'm reluctant – if Congress didn't provide one, I'm reluctant to provide one, but I don't know that we need a specific definition of jurisdiction. Let's begin first, though, that as between jurisdiction and exercise of governmental power, jurisdiction would be the primary – the threshold concern. And here, as I've established, and as many circuits have established, for example, that run-through that I explain as to when government takes land into trust, there's Indian country, thus there's jurisdiction. That's supported by the Supreme Court in Venetie. It's supported by the Fifth Circuit in Langley, Eighth Circuit in Yankton, Sioux, Tenth Circuit in the Roberts decision. But once we have established jurisdiction, which we believe is clear by case law precedence, the question of the particular instance in which the tribal has exercised its governmental authority is somewhat secondary, and most courts haven't paid significant attention to it, because, for example, if you have just a singular exercise of tribal government authority, that's sufficient. And as you recognize, Your Honor, the passage of an ordinance by a tribe is an exercise of governmental authority. There is no – there is no supporting authority that says the record must be replete with examples of it, or there must be many examples of it. And also, we have to realize that the land was acquired in 2013, the final acquisition, and this lawsuit was brought in 2016, we're not necessarily going to find a ton of examples of the way in which the tribal government exercised its governmental authority. But we have an example. The district court found that example, and so the requirements have been established. I would just like to point out also kind of an overarching principle. The Supreme Court in the Mescalero decision, and this Court in Tequila River at 967 – you okay? – 967, Fed 2nd, 1408, have set forth a guiding principle that is to be used in assessing tribal interests and state interests. Both of the courts have held that any assertion of state authority must be assessed against the crucial backdrop of, one, traditional notions of Indian sovereignty, and two, the fact that both tribes and the federal government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes. And indeed, for purposes of the Indian Reorganization Act at issue here, the Supreme Court in Mankari and this Court in Artichoke Joe's held expressly that the overriding purpose of the Indian Reorganization Act, which is the act under which the land was acquired, was to establish machinery by which tribes would assume a greater degree of self-government, both economically and politically. And more recently in Peabody, this Court concluded that the Indian Reorganization Act was conceived as a means by which to restore tribal sovereignty and to promote tribal self-governments. Now against this backdrop, it can hardly be denied that these particular and undisputed purposes of the Indian Reorganization Act can be fulfilled only if trust land acquisition under the Act results by the operation of law in the tribe having some jurisdiction over the land on which it resides. Counsel, Judge Gould, if I can interject on that point, can you explain or elaborate on the concept of concurrent jurisdiction where the tribe has some jurisdiction but the state retains some jurisdiction? For example, how that might play out, Your Honor, or? How does that work, and what precedent says that that's how the law operates? Well, I think this Court addressed, when you have assertions of, or questions of both state authority, I'm sorry, and tribal authority, I think in Barona Band, this Court addressed that most directly, stating that state jurisdiction is preempted by operation of law if it interferes with or is incompatible with federal and tribal interests reflected in federal law. So here the federal law is the Indian Reorganization Act. To the extent that state interests interfere with the federal purposes of the Indian Reorganization Act, the tribal, the state jurisdiction shifts away and makes way for the tribal and federal governments. I hope I addressed. Yes, you have. Thank you very much. Unless Your Honors have any other questions, I think we can, I just want to check to see if there's anything particular that I wanted to point out. The Club One Casino raises two arguments for the first time on appeal. If you could just briefly address whether or not they're waived, or whether we should go ahead and address those two. The first argument being, I believe, the challenge to the Secretary's two-part determination that, as we have argued in our brief, that is forfeited because it wasn't raised at all. And more importantly, perhaps, is that that decision by the agency is, was a final agency action that took place in 2012. It has been fully and finally adjudicated and is not before this Court. So there's numerous reasons under which the Court need not reach that issue. And the second — Is that the Governor of California lacked authority to concur in the Secretary's — Oh, that's not at all an issue here. And if it were, the State is an indispensable party, and the State is not a party here. The State is a sovereign government and thus couldn't be joined. So that's another issue that the Court need not or could not reach. Thank you. I'm so sorry. You have no time, but I will give you two minutes. Thank you, Your Honor. I will be depressingly brief. The new issue on appeal, I think there is abundant authority within this circuit and others that the Court has discretion to consider that issue. And I think one of the factors that's most appropriate here, it avoids having to deal with a constitutional question. We did not raise the question of the Governor's power to concur. That's before the State Supreme Court. The point we raised on appeal is that whatever the Governor said in 2012, the Governor turned around and said, I'm not going forward with this casino because the people have spoken, which is essentially a withdrawal of his concurrence. And under the Gaming Act, with after acquired property, if there's no concurrence, there's no casino gambling. It's an absolute veto. And there's no case, I know, that is considered the exact question of whether the concurrence once given can never be withdrawn, even if it's withdrawn before final action. The other thing I wanted to just respond to briefly is that, and this is, I think, I hope is responsive to Judge Gould's question, that Indian tribes clearly have inherent sovereignty. We're not saying they don't have that, but that inherent sovereignty, as the Supreme Court has taught us in the last 40 years, doesn't apply to nonmembers, unless there's a specific exception, and those aren't present here. And so you can't get through this issue by saying, well, a tribe got jurisdiction because that's wrapped up in its inherent sovereignty, and that is what the Court said in the First Circuit in Narragansett. The problem with that is, that was a decision that came before the Supreme Court spoke in Atkinson Trading and Plains Commerce Bank. I just think the Supreme Court has been very clear. If you take the inherent sovereignty cases, they don't create the kind of jurisdiction that the Gaming Act was talking about. And there has never been a case where a private party's deed has shifted and diminished a state's primary jurisdiction. It certainly doesn't provide the basis for forcing this on a state that doesn't want it. Thank you very much. Mr. Links, Mr. Rountree, appreciate your oral argument presentations today. Let me just see, before we start — before we stop, Judge Gould, did you have any other further questions? No, I have no questions. Okay. Thank you very much. Appreciate it.
judges: Cole Jr., Gould, Murguia